# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 3, 2013          Decided November 26, 2013

No. 12-7055

JOSEPH FARAH, ET AL.,
APPELLANTS

v.

ESQUIRE MAGAZINE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01179)

———

*Larry Klayman* argued the cause and filed the briefs for appellants.

*Jonathan R. Donnellan* argued the cause for appellees. With him on the brief were *Kristina E. Findikyan*, *Laura R. Handman*, and *Micah J. Ratner*. *John R. Eastburg* entered an appearance.

*Irvin B. Nathan*, Attorney General, Office of the Attorney General for the District of Columbia, *Ariel B. Levinson-Waldman*, Senior Counsel to the Attorney General, and *Todd S. Kim*, Solicitor General, were on the brief for *amicus curiae* District of Columbia in support of appellees.

2

*Seth D. Berlin* was on the brief for *amici curiae* Advance Publications, Inc., et al. in support of appellees.

Before: ROGERS and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

*Circuit Judge* BROWN concurring in the judgment.

ROGERS, *Circuit Judge*:   This case is principally a defamation action based on the publication of an article by journalist Mark Warren on *Esquire Magazine*'s Politics Blog. The article was posted one day after the release of a book entitled *"Where's the Birth Certificate? The Case that Barack Obama is not Eligible to Be President*," written by Jerome Corsi and published by Joseph Farah's WND Books. Farah's website, WorldNetDaily, announced the book launch with the headline, "**It's out! The book that proves Obama's ineligible:** Today's the day Corsi is unleashed to tell all about that 'birth certificate'" (emphasis in original).  Approximately three weeks earlier, President Obama had released his long-form birth certificate showing that he was born in Hawaii. Warren's article was entitled "**BREAKING: Jerome Corsi's Birther Book Pulled from Shelves!**" (emphasis in original).  It stated, in part: "In a stunning development one day after the release of [the Corsi book], [Farah] has announced plans to recall and pulp the entire 200,000 first printing run of the book, as well as announcing an offer to refund the purchase price to anyone who has already bought . . . the book."   Approximately ninety minutes later, *Esquire* published an "update" on its blog "for those who didn't figure it out," that Warren's article was "satire"; the "update" clarified that the article was untrue and referenced other "serious" *Esquire* articles on the birth certificate issue.  Farah observed the same day that he thought

3

the blog post was a "poorly executed parody." Also that day, Warren told *The Daily Caller* that he had no regrets about publishing the fictitious article and expressed his negative view of the book's author; his statements were published on *The Daily Caller* website that day and the following day.

Farah and Corsi filed suit for compensatory and punitive damages alleging defamation, false light, interference with business relations, invasion of privacy, and violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B). *Esquire* for all defendants moved to dismiss on several grounds, and the district court dismissed the complaint. Farah and Corsi appeal, focusing in their brief principally on the dismissal under the D.C. Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") Act, D.C. Code § 16-5501 *et. seq.*, and dismissal of the Lanham Act claim. Upon *de novo* review, we hold that the complaint was properly dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim because the blog post was fully protected political satire and the "update" and Warren's statements are protected opinion. The complaint also fails to state a claim for violation of the Lanham Act. Accordingly, we affirm the dismissal of the complaint.

## I.

Joseph Farah is the Editor and Chief Executive Officer of WorldNetDaily.com, a news and commentary Internet publication which competes with *Esquire Magazine*. *See* Compl. ¶ 2. WND Books is a wholly owned subsidiary of WorldNetDaily.com. *See id.* Jerome Corsi is a "world-renowned author of several New York Times bestsellers . . . and the author of the newly released book by WND Books, "*Where's the Birth Certificate? The Case that Barack Obama is Not Eligible to be President*." Compl. ¶ 3. These individuals and

4

entities have "at all material times covered the controversy concerning whether or not President Barack Hussein Obama is a natural-born American citizen eligible to be President." Compl. ¶ 8. According to the complaint, *see English v. Dist. of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013), "[a]bout 25 percent of the American people believe that because President Barack Obama waited many years to release what he now claims is his birth certificate, as well as other factors, that the newly released birth certificate is fraudulent." Compl. ¶ 10. The President, "wanting to try to eliminate this issue among voters and the American populace, . . . recently released what many people, including [] Corsi, have reason to believe is a fraudulent birth certificate purporting to show that he was born in Hawaii." Compl. ¶ 11.

On the morning of May 18, 2011, at 10:50 a.m., "just as [Corsi's] book was released," *Esquire* published an online article by Mark Warren entitled "**BREAKING: Jerome Corsi's Birther Book Pulled from Shelves!**" Compl. ¶ 12 (emphasis in original). The article contained "false and misleading facts" about Corsi's book. *Id.* The article, on "The Politics Blog," was accompanied by a copy of the "Drudge Siren" above an image of the book's cover. It read in full:

> **In a stunning development** one day after the release of *Where's the Birth Certificate? The Case that Barack Obama is not Eligible to be President*, by Dr. Jerome Corsi, World Net Daily Editor and Chief Executive Officer Joseph Farah has announced plans to recall and pulp the entire 200,000 first printing run of the book, as well as announcing an offer to refund the purchase price to anyone who has already bought either a hard copy or electronic download of the book.

5

In an exclusive interview, a reflective Farah, who wrote the book's foreword and also published Corsi's earlier best-selling work, *Unfit for Command: Swift Boat Veterans Speak out Against John Kerry* and *Capricorn One: NASA, JFK, and the Great "Moon Landing" Cover-Up*, said that after much serious reflection, he could not go forward with the project. "I believe with all my heart that Barack Obama is destroying this country, and I will continue to stand against his administration at every turn, but in light of recent events, this book has become problematic, and contains what I now believe to be factual inaccuracies," he said this morning. "I cannot in good conscience publish it and expect anyone to believe it."

When asked if he had any plans to publish a corrected version of the book, he said cryptically, "There is no book." Farah declined to comment on his discussions of the matter with Corsi.

A source at WND, who requested that his name be withheld, said that Farah was "rip-shit" when, on April 27, President Obama took the extraordinary step of personally releasing his "long-form" birth certificate, thus resolving the matter of Obama's legitimacy for "anybody with a brain."

"He called up Corsi and really tore him a new one," says the source. "I mean, we'll do anything to hurt Obama, and erase his memory, but we don't want to look like fucking idiots, you know? Look, at the end of the day, bullshit is bullshit."

6

Corsi, who graduated from Harvard and is a
professional journalist, could not be reached for
comment.

According to the complaint, "[i]mmediately" after the blog
posting, "news organizations, readers of WorldNetDaily,
purchasers and distributors of WND Books and others began
contacting [] Farah for confirmation of the story and comment."
Compl. ¶ 10.  Also, "consumers began requesting refunds[,] . . .
book supporters began attacking Farah and Corsi[,] [and] [b]ook
stores . . . began pulling the book from their shelves, or not
offering it for sale at all."  Compl. ¶ 13.  Only after Farah
"issued a statement saying he was exploring legal options
against *Esquire* and Warren did they purport to issue a
disclaimer."  Compl. ¶ 14.  This "so-called disclaimer" was "as
false[] [and] misleading . . . as the initial story that was
published" on the website.  *Id.*  It read in full:

DEVELOPING . . .

***UPDATE, 12:25 p.m.***, *for those who didn't figure it
out yet, and the many on Twitter for whom it took a
while*: We committed satire this morning to point out
the problems with selling and marketing a book that
has had its core premise and reason to exist gutted by
the news cycle, several weeks in advance of
publication.  Are its author and publisher chastened?
Well, no.  They double down, and accuse the President
of the United States of perpetrating a fraud on the
world by having released a forged birth certificate.  Not
because this claim is in any way based on reality, but
to hold their terribly gullible audience captive to their
lies, and to sell books.  This is despicable, and deserves
only ridicule.  That's why we committed satire in the
matter of the Corsi book.  Hell, even the president has

7

a sense of humor about it all. Some more serious
reporting from us on this whole "birther" phenomenon
here, here, and here.

**Tags**: birther book, jerome corsi, where's the birth
certificate, drudge without context, birthers, wingnuts,
humor

Later that day Warren told *The Daily Caller*, an online
publication read by an audience that is interested in the "birther"
issue, *see* Compl. ¶ 15, that he had "no regrets" about posting
the articles and referred to Corsi as an "execrable piece of shit."
*Id.* Warren's statements were published on *The Daily Caller*
website on May 18 and 19, 2011, *see id.*, remain on the Internet,
and have been widely published domestically and around the
world. Compl. ¶ 16.

Farah and Corsi, however, "never contemplated, much less
offered, to pull the [Corsi] book from shelves" or "refund
purchases to consumers." Compl. ¶ 17. Rather, they "believed
at all material times that the contents of the book are accurate
and newsworthy." *Id. Esquire*'s representations "resulted in
books being pulled from the shelves by booksellers, harmed
sales and damaged [Farah's and Corsi's] goodwill and
reputation . . . among the buying and consuming public." *Id.*

On June 28, 2011, Farah and Corsi sued Esquire Magazine,
Inc., Hearst Communications, Inc., and Warren (together
"*Esquire*") for defamation, false light, tortious interference with
business relations, and invasion of privacy, as well as violation
of the Lanham Act, 15 U.S.C. § 1125(a). The complaint alleged
that *Esquire* maliciously made false and defamatory statements
that caused damage to their business, good will, and reputations,
*see* Compl. ¶¶ 19–20, and "held . . . Farah and Corsi up for
extreme ridicule in the community where they reside and where

8

their works are viewed and read." Compl. ¶ 22. Further, the complaint alleged that *Esquire*, with knowledge of Farah's "business relationship with distributors and booksellers," intentionally interfered with these relationships causing "abridgment, limitation, breach or termination of these relationships as concerns the sale of the [Corsi] book." Compl. ¶¶ 26–28. The complaint alleged a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B) in that *Esquire* is a "commercial competitor[]" of Farah and Corsi, and that its "publication of false and misleading information and description of fact" "caused confusion, mistake and deception" concerning the "accuracy, motives, nature, characteristics, and qualities of" the Corsi book. Compl. ¶¶ 31–32. The complaint sought in excess of $100 million for actual and compensatory damages, and punitive damages in excess of $20 million. *See* Compl. ¶ 38.

*Esquire* moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). It also filed a special motion to dismiss the tort claims pursuant to the D.C. Anti-SLAPP Act, D.C. Code § 16-5501 *et seq.* To illustrate the political and social context in which its statements were made, *Esquire* attached to its motions the WorldNetDaily website's complete archive of articles on President Obama's ineligibility to serve, including articles by Farah published online from September 2009 through August 2011, as well as samples of *Esquire*'s satirical publications. *See* Findikyan Decl. Exs. 1–46. The district court granted both motions, concluding, *inter alia*, that *Esquire*'s statements were protected under the First Amendment and that the Lanham Act did not apply to the non-commercial speech at issue. *See Farah v. Esquire*, 863 F. Supp. 2d 29, 39–41 (D.D.C. 2012).

9

## II.

To meet the requirements for defamation under District of Columbia law, a plaintiff must prove (1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) (citing *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997)). A statement is "defamatory" if it tends to injure the plaintiff in his trade, profession or community standing, or to lower him in the estimation of the community. *See Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990). This court, in reviewing the dismissal of the complaint, "must assume, as the complaint alleges, the falsity of any express or implied factual statements made" in the publications at issue. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001). The court must also assume that *Esquire* made such statements with the requisite state of mind. *Id.* And, "[i]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006)). Judicial notice is properly taken of publicly available historical articles such as were attached to *Esquire*'s motions to dismiss. *See* Fed, R. Evid. 201(b); *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991); *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 683 n.12 (D.C. Cir. 1983) (citing 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE, §§ 15:1-15:4 (1980)).

"Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of . . . First Amendment freedoms, the Constitution

10

imposes stringent limitations upon the permissible scope of such liability." *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 12 (1970). Various doctrinal protections preserve "the breathing space which freedoms of expression require in order to survive." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (quotation marks, alteration, and citation omitted). Indeed, this court has observed that summary proceedings are essential in the First Amendment area because if a suit entails "long and expensive litigation," then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails. *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).

Under the First Amendment, liability for defamation arises only if, at a minimum, a defendant's statement "reasonably implies false and defamatory facts." *Milkovich*, 497 U.S. at 20. Implicit in this requirement are three protections: First, the First Amendment "provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)); *see also Weyrich*, 235 F.3d at 624. Where a defendant's statement "cannot be construed as representations of fact," *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974), there can be no defamation. Second, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved." *Milkovich*, 497 U.S. at 19–20. In other words, a defendant cannot be held liable unless the alleged defamatory statement or implied premise is "verifiable." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("*Moldea II*"). Where a statement is so imprecise or subjective that it is not capable of being proved true or false, it is not actionable in defamation. *See Weyrich*, 235 F.3d at 624–26. And third, a defendant will not face liability unless the disputed

11

statement is "reasonably capable of defamatory meaning." *Id.* at 623. These threshold inquiries are questions of law for the court to decide. *See Weyrich*, 235 F.3d at 623–24, 627; *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1142, 1144 (D.C. Cir. 1994) (*"Moldea I"*).

To determine whether *Esquire*'s statements could reasonably be understood as stating or implying actual facts about Farah and Corsi and, if so, whether those statements were verifiable and were reasonably capable of defamatory meaning, the "publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (*en banc*). "[T]he First Amendment demands" that the court assess the disputed statements "in their proper context." *Weyrich*, 235 F.3d at 625. Context is critical because "it is in part the *settings* of the speech in question that makes their . . . nature apparent, and which helps determine the way in which the intended audience will receive them." *Moldea II*, 22 F.3d at 314. "Context" includes not only the immediate context of the disputed statements, but also the type of publication, the genre of writing, and the publication's history of similar works. *See Letter Carriers*, 418 U.S. at 284–86; *Moldea II*, 22 F.3d at 314–15. The "broader social context," too, is vital to a proper understanding of the disputed statements. *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984). After all, "[s]ome types of writing . . . by custom or convention signal to readers . . . that what is being read . . . is likely to be opinion, not fact. It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." *Id.*

The Supreme Court has repeatedly extended First Amendment protection to statements that, in context, do not

12

reasonably state or imply defamatory falsehoods in the requisite sense. In *Greenbelt*, 398 U.S. at 13–15, the Court concluded that use of the word "blackmail" to describe the plaintiff's hard-nosed negotiating tactics could not reasonably be understood to mean the plaintiff had committed a criminal offense. In context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Id.* at 14. Consequently, "the imposition of liability . . . was constitutionally impermissible" because "as a matter of constitutional law, the word 'blackmail' . . . was not slander when spoken, and not libel when reported in the Greenbelt News Review." *Id.* at 13. Similarly, in *Letter Carriers*, 418 U.S. at 283–87, the Court held that the use of the word "traitor" in a literary definition accompanying a union-published "List of Scabs" could not reasonably be understood to accuse the listed individuals of treason, because the word was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members." And in *Hustler Magazine*, 485 U.S. at 50, the Court held that an ad parody depicting the Rev. Jerry Falwell in an incestuous relationship with his mother could not support an emotional distress claim because the offending speech "could not reasonably have been interpreted as stating actual facts about the public figure involved." So instructed, this court held in *Weyrich*, 235 F.3d at 624–25, that a political magazine's statement that a conservative leader "began to suffer bouts of pessimism and paranoia" following his successful rise to power was not actionable because, in context, the description was merely "rhetorical sophistry, not a verifiably false attribution *in fact* of a 'debilitating mental condition'" as the plaintiff had contended.

13

*Esquire* maintains that Farah and Corsi have no cognizable defamation claim because the blog post is fully protected satire. "Satire" is a long-established artistic form that uses means such as "ridicule, derision, burlesque, irony, parody, [or] caricature" to censure the "vices, follies, abuses, or shortcomings" of an individual or society. *Satire*, ENCYC. BRITANNICA ONLINE, http://www.britannica.com/EBchecked/topic/524958/satire (last visited Nov. 1, 2013). Although satire has been employed since the time of Ancient Greece, it remains "one of the most imprecise" of all literary designations — a notoriously broad and complex genre whose "forms are as varied as its victims." *Id.* Sometimes satire is funny. *See, e.g.*, *Saturday Night Live* (NBC television broadcast); THE ONION, http://www.theonion.com (last visited Nov. 1, 2013). Othertimes it may seem cruel and mocking, attacking the core beliefs of its target. *See, e.g., Hustler Magazine*, 485 U.S. 46. And sometimes it is absurd, as in the classic example of Jonathan Swift's proposal to "solve" the problem of Irish poverty by killing and eating Irish children. *See* JONATHAN SWIFT, A MODEST PROPOSAL (1729). Satire's unifying element is the use of wit "to expose something foolish or vicious to criticism." *Satire*, ENCYC. BRITANNICA ONLINE. A "parody" is to the same effect: the style of an individual or work is closely imitated for comic effect or in ridicule. *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 846 (10th ed. 1993) ("parody"); *see id.* at 1038 ("satire").

Despite its literal falsity, satirical speech enjoys First Amendment protection. Consistent with the "actual facts" requirement, "the 'statement' that the plaintiff must prove false . . . is not invariably the literal phrase published but rather what a reasonable reader would have understood the author to have said." *Milkovich*, 497 U.S. at 23–24 (Brennan and Marshall, JJ., in dissent agreeing with majority); *see also Hustler Magazine*, 485 U.S. at 50. Thus, a satire or parody must

14

be assessed in the appropriate context; it is not actionable if it "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20 (quotation marks and alterations omitted). In light of the special characteristics of satire, of course, "what a reasonable reader would have understood" is more informed by an assessment of her well-considered view than by her immediate yet transitory reaction. Without First Amendment protection, there is a risk that public debate would "suffer for lack of 'imaginative expression'" and "the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Id.* (quoting *Hustler Magazine*, 485 U.S. at 53–55).

Farah and Corsi do not suggest that satire, as a genre, lacks constitutional protection. Rather, in their view *Esquire*'s *particular attempt* at satire is not protected because reasonable readers would take the fictitious blog post literally. They point to the inquiries they received following the blog post, as well as to *Esquire*'s own "update" clarifying that the post was satire, as evidence that many actual readers were misled by *Esquire*'s story. But it is the nature of satire that not everyone "gets it" immediately. For example, when Daniel Defoe first published *The Shortest Way with the Dissenters*, an anonymous satirical pamphlet against religious persecution, it was initially welcomed by the church establishment Defoe sought to ridicule. *See* JAMES SUTHERLAND, ENGLISH SATIRE 83–84 (1958). Similarly, Benjamin Franklin's "Speech of Miss Polly Baker," a fictitious news story mocking New England's harsh treatment of unwed mothers, was widely republished in both England and the United States as actual news. *See* MAX HALL, BENJAMIN FRANKLIN & POLLY BAKER: THE HISTORY OF A LITERARY DECEPTION 33–35, 87–88 (1960).

Indeed, satire is effective as social commentary precisely because it is often grounded in truth. In a similar case involving

15

a satirical news article, the Texas Supreme Court observed that satire works by "distort[ing] . . . the familiar with the pretense of reality in order to convey an underlying critical message." *New Times v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004) (quotation marks omitted). Here, too, *Esquire*'s story conveyed its message by layering fiction upon fact. *Cf. Weyrich*, 235 F.3d at 626. The test, however, is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection). *See Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 442–43 (10th Cir. 1982); *see also Mink v. Knox*, 613 F.3d 995, 1007 (10th Cir. 2010); *New Times*, 126 S.W.2d at 155, 157–58; *Garvelink v. Detroit News*, 522 N.W.2d 883, 886 (Mich. 1994); *Hoppe v. Hearst Corp.*, 770 P.2d 203, 206 (Wash. 1989); *Myers v. Boston Magazine Co., Inc.*, 403 N.E.2d 376, 379–80 (Mass. 1980). And to the extent Farah and Corsi rely on *Esquire*'s "update" to demonstrate reader confusion, *Esquire* can hardly be penalized for attempting to set the record straight and *avoid* confusion by those readers who did not at first "get" the satirical nature of Warren's article.

Considering the blog post in its context, the reasonable reader could not understand Warren's article to be conveying "real news" about Farah and Corsi. The article's primary intended audience — that is, readers of "The Politics Blog" — would have been familiar with *Esquire*'s history of publishing satirical stories, with recent topics ranging from Osama Bin Laden's television-watching habits to "Sex Tips from Donald Rumsfeld." *See* Findikyan Decl. Exs. 35–42. At the same time, followers of "The Politics Blog" were politically informed readers. The "update" notes that *Esquire*.com had previously featured several "serious" reports on the birth certificate issue. Farah and Corsi acknowledge that they were well-known leaders of the movement questioning President Obama's eligibility, *see* Compl. ¶¶ 8–9, and admit that readers of *Esquire*.com would have been familiar with WorldNetDaily and its positions, *see*

16

Compl. ¶ 15; Appellants' Br. 15.  The postings on Farah's own website show that he has been writing on the issue for years, and Corsi's then-forthcoming book had recently received publicity on the Drudge Report.  Findikyan Decl. Exs. 1, 19.  It defies common sense to suppose that readers of "The Politics Blog" were unaware of the birth certificate controversy or the heated debate it had provoked.

With that baseline of knowledge, reasonable readers of "The Politics Blog" would recognize the prominent indicia of satire in the Warren article.  Most notably, the very substance of the story would alert the reasonable reader to the possibility that the post was satirical.  The essence of the fictitious story was that Farah, a self-described leader (along with Corsi) of the movement to challenge President Obama's eligibility to serve, *see* Appellants' Br. 31, had suddenly and without any warning decided to recall and "pulp" the Corsi book the very day after it was released.  The supposed basis for this decision was President Obama's earlier release of his long-form birth certificate; yet that release occurred three weeks before Corsi's book was published, and, as Farah acknowledges, he and Corsi remained (and still remain) committed to the book even after that event.  *See* Compl. ¶¶ 11, 17.  *After* the release of the birth certificate, Farah appeared on MSNBC and published more than 40 articles on WorldNetDaily continuing to promote the book. *See* Findikyan Decl. Exs. 7, 21, 22–25; *Farah*, 863 F. Supp.2d at 32.  The day of the Corsi book's release — the day before *Esquire* posted its fictitious story — WorldNetDaily announced the publication on its website with an article entitled, **"It's out! The book that proves Obama's ineligible:** Today's the day Corsi is unleashed to tell all about that 'birth certificate.'"  Findikyan Decl. Ex. 26.  It is inconceivable that Farah would reverse course so abruptly, as *Esquire*'s fictitious story claimed. Readers of "The Politics Blog" would have recognized that the article was "reporting" events and statements that were totally

17

inconsistent with Farah's and Corsi's well-publicized views, and could not reasonably have taken the story literally.

A number of humorous or outlandish details in the blog post also betray its satirical nature.  The story attributes to Corsi an obviously fictitious book entitled, *Capricorn One: NASA, JFK, and the Great "Moon Landing" Cover-Up*.  Of all prominent cover-ups featured in the news in recent years, a moon cover-up — much less "the Great 'Moon Landing' Cover-Up" — was not among them.  Further, the story includes incredible counter-factual statements like, "[Farah] said cryptically, 'There is no book.'"  Farah had published and released the book and then confirmed the next day to *The Daily Caller* that the book "was selling briskly.  I am 100 percent behind it."  Findikyan Decl. Ex. 28.  The story repeatedly attributes to a "source at WND" quotes that are highly unorthodox for a real news story, such as Farah was "rip-shit," "bullshit is bullshit," and "we don't want to look like fucking idiots, you know?"

Stylistic elements, such as the exclamatory headline and the use of the "Drudge Siren" symbol, also would indicate to the reasonable reader that the story was not serious news.  Like Farah, a reader familiar with WorldNetDaily would recognize the headline as a parody of WorldNetDaily's own sensationalistic headlines.  The Drudge Siren (supplemented here by the tag "Drudge Without Context") is a symbol of sensationalistic news from a self-described conservative best known for breaking the Monica Lewinsky scandal.  *Matt Drudge*, Encyc. Britannica Online, http://www.britannica.com/EBchecked/topic/171936/Matt-Drudge (last visited Nov. 1, 2013).  Readers familiar with the birth certificate controversy would be aware that Corsi's book had received substantial publicity on the Drudge Report. Findikyan Decl. Ex. 19.  For anyone with knowledge of that

18

context, *Esquire*'s use of the symbol would be understood as an ironic joke.

Even if none of these elements standing alone — the story's substance, outlandish and humorous details, stylistic elements — would convince the reasonable reader that the blog post was satirical, taken in context and as a whole they could lead to no other conclusion. Farah immediately recognized the blog post as a "parody," although he told *The Daily Caller* that in his view it was "a very poorly executed" one. Findikyan Decl. Ex. 28. Admittedly, apart from its headline, the article did not employ the sort of imitation and exaggerated mimicry that are typical of parody. But satire is a far broader concept than parody, incorporating a variety of literary forms and devices. And poorly executed or not, the reasonable reader would have to suspend virtually all that he or she knew to be true of Farah's and Corsi's views on the issue of President Obama's eligibility to serve in order to conclude the story was reporting true facts.

Because the reasonable reader could not, in context, understand *Esquire*'s blog post to be conveying "real news" — that is, actual facts about Farah and Corsi — the blog post was not actionable defamation. To the contrary, almost everything about the story and the nature of the issue itself showed it was political speech aimed at critiquing Farah's and Corsi's public position on the issue of President Obama's eligibility to hold office even after he had released his long-form birth certificate showing he was born in Hawaii. Farah and Corsi were entitled to express their opinion that its delayed release signaled it was a forgery, but they could not then sue for defamation because *Esquire* conveyed its contrary view by using satire, rather than straightforward attack. Because the blog post was entitled to First Amendment protection, the district court properly dismissed the defamation count as to the blog post for failure to state a claim.

19

**B.**

Likewise, *Esquire*'s "update" and Warren's post-publication comments to *The Daily Caller* are protected because they merely represented *Esquire*'s interpretation of Farah's and Corsi's publications on the well-known facts underlying the dispute over the President's birthplace. In *Moldea I*, 15 F.3d at 1144–45 (citations omitted), this court explained that

> when a writer gives a statement of opinion that is based upon *true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts. Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation. Thus, the statement "In my opinion Jones is a liar because he cheats on his taxes" would not be actionable if Jones had in fact recently been convicted of tax evasion, so long as the statement did not imply additional, unstated bases for calling Jones a liar. While it might be wholly unreasonable to attack Jones' veracity on the basis of his tax returns, a reader would be free to make his or her own assessment of the facts presented.

The "update" and Warren's comments used strong rhetoric and salty language, but were nonetheless public statements on an issue of national concern; such speech lies at the heart of the First Amendment. *See, e.g., Greenbelt*, 398 U.S. at 11–12.

The "update" statement that Farah and Corsi are spreading "lies" is protected opinion because it is based on *Esquire*'s revealed premise that Farah and Corsi have promoted the Corsi

20

book notwithstanding evidence that its central claim is false.
The "update" statement regarding Farah's and Corsi's "terribly
gullible audience" is also protected opinion, premised on the fact
that a sizeable minority of people — by Farah's estimation, 25%
of the American populace, *see* Compl. ¶ 10 — believes in a
position that *Esquire* considers absurd. The statement that Farah
and Corsi are not motivated by genuine belief, but rather by a
desire to hold their readers "captive" and "to sell books" cannot,
in context, be reasonably read to imply special knowledge of
their actual motives. It is based, like the other statements, on
*Esquire*'s revealed premise that Farah and Corsi continue to
"sell[] and market[] a book that has had its core premise and
reason to exist gutted by the news cycle, several weeks in
advance of publication." Any reasonable reader of political blog
commentary knows that it often contains conjecture and strong
language, *see, e.g.,* Findikyan Decl. Exs. 2–5, particularly where
the discussion concerns such a polarizing topic as the
President's birth certificate. A reasonable reader would
understand Warren's statements to be expressions of his own
opinion. His reference to Corsi as an "execrable piece of shit,"
does not appear to convey *any* factual assertion, but is rather
"the sort of loose, figurative or hyperbolic language which
would negate the impression" that a factual statement was being
made. *Milkovich*, 497 U.S. at 21. And to the extent the
comment implies the same factual premise as the "update," it is
similarly protected.

Because the "update" and Warren's post-publication
comments to *The Daily Caller* are not actionable in defamation,
the district court properly dismissed the defamation count based
on those statements for failure to state a claim.

## C.

Because Farah's and Corsi's defamation claim fails, so do
their other tort claims based upon the same allegedly defamatory

21

speech.  "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea II*, 22 F.3d at 319–20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991)).  The First Amendment considerations that apply to defamation therefore apply also to Farah's and Corsi's counts for false light, s*ee Weyrich*, 235 F.3d at 628, and tortious interference.  *See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor Servs., Inc.*, 175 F.3d 848, 857 (10th Cir. 1999); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196–97 (8th Cir. 1994); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990).  Farah and Corsi do not pursue their invasion of privacy claim on appeal and it is forfeited.  *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1105 n.1 (D.C. Cir. 2012).

## III.

The Lanham (Trademark) Act, 15 U.S.C. § 1051 *et seq.*, prohibits deceptive trade practices such as false advertising and trademark infringement.  Section 1125 provides for civil liability in the case of

> [a]ny person who, on or *in connection with any goods or services*, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . . false or misleading description of fact, or false or misleading representation of fact, which–

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the . . . sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

22

> (B) in commercial advertising or promotion,
> misrepresents the nature, characteristics, qualities,
> or geographic origin of his or another person's
> goods, services, or commercial activities[.]

15 U.S.C. §1125(a)(1)(A) & (B) (emphasis added).

Every circuit court of appeals to address the scope of these
provisions has held that they apply only to commercial speech.
*See, e.g., Utah Lighthouse Ministry v. Found. for Apologetic
Info. & Research*, 527 F.3d 1045 (10th Cir. 2008); *Bosley Med.
Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005); *see also
Farah*, 863 F. Supp. 2d at 40 (collecting cases).  For example,
the Tenth Circuit in *Utah Lighthouse Ministry*, 527 F.3d 1045,
dismissed the Lanham Act claims against the creators of a
parody website that used the name and web design elements of
a religious bookstore to critique the bookstore's views.  The
court explained that "[u]nless there is a competing good or
service labeled or associated with the plaintiff's trademark, the
concerns of the Lanham Act are not invoked." *Id.* at 1054.
Similarly, the Ninth Circuit in *Bosley*, 403 F.3d at 679, held that
there was no liability where an unsatisfied hair transplant
customer had used Bosley's mark for purposes of criticism,
because the customer's "use of the Bosley mark [was] not in
connection with a sale of goods or services — it [was] in
connection with the expression of his opinion *about* Bosley's
goods and services."  As support for the assertion that "many
courts have applied the Lanham Act to non-commercial speech,"
Appellants' Br. 14, Farah and Corsi cite only a self-described
"'promotional goods' case" involving the title of a talk-radio
news show, *see PAM Media, Inc. v. American Research Corp.*,
889 F. Supp. 1403, 1407 (D.Colo. 1995).

The statements posted on the *Esquire*.com "Politics Blog"
cannot plausibly be viewed as commercial speech under

23

§ 1125(a)(1)(A) or (B) of the Lanham Act. *See* Compl. Count IV. Farah and Corsi do not allege that *Esquire* is selling or promoting a competing book. Instead, they assert that "generally" *Esquire* is their competitor, Compl. ¶ 31, and maintain that they too "write frequently about the birth certificate and 'natural born citizen' issues," and that "readers frequently [] read publications that contain 'points and counterpoints.'" Appellants' Br. 15. Of course, writers write and publishers publish political tracts for commercial purposes, and it is possible that the kinds of commercial methods made illegal by the Lanham Act could be applied to such tracts. The actions alleged, however, do not involve such methods. The mere fact that the parties may compete in the *marketplace of ideas* is not sufficient to invoke the Lanham Act. To the contrary, it reinforces *Esquire*'s position that its blog post was political speech aimed at critiquing Farah's and Corsi's position on the birth certificate question. As our sister circuits have emphasized, "trademark rights cannot be used 'to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view.'" *Utah Lighthouse Ministry*, 527 F.3d at 1052–53 (citing *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987); *Bosley*, 403 F.3d at 675).

Accordingly, we affirm the dismissal of the complaint pursuant to Rule 12(b)(6) for failure to state a claim, and we have no occasion to address Farah's and Corsi's other challenges to the dismissal of their complaint because our analysis moots any consideration of the Anti-SLAPP Act.